**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**


**RONALD E. JARMUTH,**

            **Plaintiff,**

**v.**                            **//    CIVIL ACTION NO. 1:04CV63**
                                    **(Judge Keeley)**

**JAMES M. FRINZI,**

            **Defendant.**


### AMENDED[1] MEMORANDUM OPINION AND ORDER

In this case, the *pro se* plaintiff, Ronald Jarmuth
("Jarmuth"), alleges that the defendant, James Frinzi ("Frinzi"),
and agents acting on his behalf, published defamatory statements
about him to his employer, the Federal Bureau of Investigation
("FBI"), in West Virginia.  On Monday, June 12, 2006, the Court
conducted a final pretrial conference, and dismissed Jarmuth's West
Virginia common law defamation claim as untimely because the
factual record of this case clearly establishes that, more than one
year prior to the filing of his complaint, Jarmuth had knowledge of
the challenged statements found capable of a defamatory meaning.
Moreover, the Court concluded that Jarmuth's reliance on the

---

[1]     The sole purpose of this amended order is to **VACATE** the
Court's Order granting-in-part Jarmuth's motion for reconsideration
of the Magistrate Judge's Order sealing from public view the entire
record in this case (Docket No. 212), and **ORDER** that the docket in
this case remain **SEALED** from public view until further proceedings
occur on that issue.

tolling provision of 28 U.S.C. §1367(d) did not cure the tardiness of his common law claim.

## I. Factual Background

In November, 1999, Jarmuth began contract work with the FBI's Internet Fraud Complaint Center ("IFCC") in Fairmont, West Virginia ("WV"). Shortly thereafter, in or about December, 1999, Jarmuth developed a relationship with Frinzi's ex-wife, Angela Frinzi ("Angela"), and the Frinzis' minor daughter. At that time, Jarmuth and Angela lived in the same housing development in Morgantown, WV, while Frinzi and his "live in" girlfriend, Kathleen Waters ("Waters"), lived in Fayette County, Pennsylvania. Angela and Frinzi shared custody of their daughter.

On July 12, 2000, Jarmuth met Frinzi and Waters at the Nemacolin Woodlands Resort in Fayette County, Pennsylvania. During that meeting, Waters tape-recorded the parties' conversation without Jarmuth's knowledge. On or about August 10, 2000, Jarmuth informed his FBI supervisor, Tim Healy ("Healy"), about the meeting with Frinzi and Waters and discussed his suspicions that the Frinzis' daughter was being abused by them. Jarmuth was interviewed and gave a statement under oath concerning the allegations. The FBI subsequently contacted the Pennsylvania State Police, who in turn contacted the Fayette County Child and Youth

**AMENDED MEMORANDUM OPINION AND ORDER**

Services ("CYS"). After an investigation was opened into alleged abuses by them, Frinzi and Waters turned over the tape recording made during the meeting at Nemacolin ("Nemacolin Tape") to investigating authorities in Pennsylvania, alleging that it contained admissions by Jarmuth that he and Angela had sexually abused the Frinzis' child.[2] The Nemacolin Tape was subsequently destroyed by the Pennsylvania State Police and never provided to anyone in West Virginia. On September 1, 2000, Jarmuth learned of the existence of the Nemacolin Tape while in Healy's office, during a telephone conversation between Healy and Pennsylvania State Trooper Andre Stevens ("Trooper Stevens"). Subsequently, on October 12, 2000, he filed suit against Frinzi, Waters, and Todd Begg ("Begg"), the attorney for Frinzi and Waters, in the U.S. District Court for the Western District of Pennsylvania. That suit alleged various claims based on both federal and Pennsylvania wiretap laws, as well as common law claims for invasion of privacy

---

[2]     Upon referral by the Fayette County CYS, an investigation of alleged abuse of the Frinzis' daughter by Frinzi and Waters was opened by the West Virginia Department of Health and Human Resources. However, both the Pennsylvania and West Virginia investigations were subsequently dropped with no findings of abuse by any party.

**AMENDED MEMORANDUM OPINION AND ORDER**

and defamation under Pennsylvania law.[3]   An attorney, Joseph J.
Schwerha, IV, represented Jarmuth in the Pennsylvania action.

On November 15, 2000, Jarmuth, by Mr. Schwerha, filed a
similar action against Frinzi, Waters and Begg in the Court of
Common Pleas of Fayette County, Pennsylvania. That suit sought both
legal and equitable relief for violation of both state and federal
wiretap laws, as well as a declaration that Jarmuth had not
committed any acts of child abuse as alleged by the defendants.[4]
In his complaint, Jarmuth specifically outlined the charges he
alleged  Frinzi and Waters had made against him.[5]

On or about November 27, 2000, Waters sent a letter to Healy
at the FBI in West Virginia containing allegations of sexual
impropriety with the Frinzis' daughter on the part of Jarmuth and
Angela.   Attached to that letter was a copy of the complaint

---

[3]     Civil Action No. 00-CV-2031.

[4]     Civil Division No. 2307 of 2000 GD.

[5]     Jarmuth's complaint in the Fayette County Court of Common Pleas
action states at paragraph 47 that:

Defendants have accused Plaintiff of:
a.  Having sex between him and the mother in plain view of the child.
b.  Freely walking around nude in front of the child (accusation raised
in October, 2000).
c.  Teaching the child to masturbate, and gratifying himself with her
doing so.
d.  Exposing the child to sexually inappropriate material on TV, and
imparting an inappropriate knowledge of sexuality.
e.  Being a hazard to the child's mental and physical health.

-4-

## AMENDED MEMORANDUM OPINION AND ORDER

Jarmuth had filed in the Court of Common Pleas together with hand written margin notes. Included in those documents was the statement that "ON TAPES, RON ADMITTED TO REGULARLY HAVING SEX WITH ANGELA IN THE SAME BED WITH [the Frinzis' child]."[6] On or about that same date, Healy showed the letter to Jarmuth, but did not allow Jarmuth to photocopy it.

Thereafter, on or about December 22, 2000, Jarmuth filed an amended complaint in the case pending in the Western District of Pennsylvania. Count VI of that complaint was a common law defamation claim which, in paragraph 79, alleged that at least one of the defamatory communications was from "Waters . . . to Plaintiff's supervisor."

In a letter dated February 14, 2001, the FBI offered Jarmuth a conditional appointment as a Computer Scientist. The conditions on Jarmuth's appointment included, among others, "successful completion of a background investigation, preemployment polygraph and urinalysis drug test."[7] On April 21, 2001, in another letter,

---

[6]     As discussed *infra*, two additional statements reiterating the same claim were also included in Water's correspondence with Healy.

[7]     The letter went on to state that:

We will withdraw an employment offer if the investigation reveals information that precludes a security and/or suitability clearance (e.g., serious credit problems, abuse of alcohol, history of usage of controlled substances, and misrepresentations of the application). It creates significant hardship, we want to alert you to these potential problems now, at the outset, and invite you to

**AMENDED MEMORANDUM OPINION AND ORDER**

the FBI rescinded its offer of appointment to Jarmuth. In the
interim, Waters had contacted the FBI inquiring about Jarmuth.
Jarmuth now asserts that those phone calls and others, as well as
Waters' letter to Healy, were defamatory and led to the termination
of his employment with the FBI.

## II. **Procedural History**

On April 6, 2004, Jarmuth filed his complaint against Frinzi
and Waters in this case based on diversity of citizenship
jurisdiction. 28 U.S.C. § 1332. Counts I, II, and III all alleged
violations of Pennsylvania wiretap laws by Frinzi and Waters
relating to the parties' July 12, 2000, meeting at Nemacolin.
Count IV alleged a common law invasion of privacy claim against
Frinzi and Waters based on the same event, while Count V alleged a
common law defamation claim based on the defendants' subsequent
publication of defamatory communications to Jarmuth's employers in
West Virginia.

On March 31, 2005, the Court ruled on the defendants' motion
to dismiss for lack of personal jurisdiction and failure to state
a claim, and found that personal jurisdiction existed over Frinzi,
but not over Waters. After it dismissed the claims against Waters,

---

discuss any concerns you may have.

it analyzed the claims against Frinzi.  That analysis began with a

discussion of choice of law:

> 'In proceedings where there is no controlling
> constitutional provision or act of Congress, a federal
> court must apply the substantive law of the state in
> which it sits, including the state's choice-of-law
> rules.' <u>Brewer v. Nat'l Indem. Co.</u>, 363 F.3d 333, 338
> (4th Cir. 2004).  Under West Virginia law, tort cases are
> governed by the law of the place of the wrong. <u>Blais v.</u>
> <u>Allied Exterminating Co.</u>, 198 W.Va. 674, 677 (1996).
>
> In their motion, the defendants challenge the
> validity of all counts against them, *except for Count V*,
> Jarmuth's defamation claim.  The *challenged* counts all
> relate to their alleged illegal tape-recording of
> Jarmuth's conversation, which occurred in Pennsylvania.
> Therefore, under <u>Blais</u>, the Court will analyze *the legal*
> *issues raised* applying Pennsylvania law.

(1:04CV63, Doc. No. 13 at 11)(emphasis added).

With this framework in place, the Court proceeded to dismiss

Counts I, II, III, and IV against Frinzi, which left only Count V,

the unchallenged common law defamation claim.  In that Count,

Jarmuth alleges that, between September, 2000 and April, 2001,

Frinzi, and agents acting on his behalf, made a series of

defamatory communications to his FBI employers in West Virginia

with the intent to interfere with his employment.  The

communications allegedly included multiple telephone calls from

Waters, Trooper Stevens, and Pennsylvania State Trooper Sandra

Soliday ("Trooper Soliday") to Healy and others associated with the

FBI who could influence Jarmuth's employment status, as well as the letter Waters admitted writing to Healy.

During the discovery process, United States Magistrate Judge John S. Kaull ordered the release of certain internal FBI records ("FBI records") he deemed to be both responsive to a subpoena from the defendant and potentially relevant to the contested issues. The Court subsequently upheld that ruling. However, given Jarmuth's concerns for the potential sensitivity of the documents released, the parties agreed that the documents should be provided to the Court for *in camera* review. Further, the parties recognized that the FBI records could contain information dispositive of Jarmuth's defamation claim. On March 27, 2006, therefore, the FBI provided those documents to the Court.

Shortly before the FBI documents were received, however, on March 13, 2006, Frinzi moved the Court for summary judgment, arguing that, pursuant to West Virginia law, Jarmuth had failed to meet his burden with regard to at least one of the essential elements of his common law defamation claim.

### III. **Choice of Law: Defamation Claim**

The common law tort of defamation requires, among other things, the non-privileged publication of a defamatory communication to a third party. In this case, Jarmuth alleges that

-8-

Frinzi, and others acting on his behalf, published defamatory communications to his employer in West Virginia with the intent to interfere in his employment here. As noted in the Court's prior order, under West Virginia law, tort cases are governed by the law of the place of the wrong. <u>Blais</u>, 198 W.Va. at 677. Here the alleged wrong took place in West Virginia. Thus, West Virginia law applies to the consideration of Jarmuth's defamation claim.

## IV. <u>Discussion</u>

### a. Analysis Overview

"An action for defamation is subject to a one-year statute of limitations under *W.Va.Code*, 55-2-12 [1959]." <u>Garrison v. Herbert J. Thomas Memorial Hospital Association</u>, 190 W.Va. 214, 438 S.E.2d 6, 13 (1993)(citing <u>Padon v. Sears Roebuck & Co.</u>,186 W.Va. 102, 411 S.E.2d 245 (1991). Further, "[i]n defamation actions, the period of the statute of limitations begins to run when the fact of the defamation becomes known, or reasonably should have been known, to the plaintiff." <u>Id.</u> at n. 9 (citing <u>Padon</u>, 411 S.E.2d at syl.pt.).

To properly analyze whether Jarmuth brought his defamation claim within the applicable limitations period, the Court must determine 1) what, if any, communications made by Frinzi, or others acting on his behalf, were capable of a defamatory meaning under West Virginia law, and 2) of those communications, when did Jarmuth

know, or when should he reasonably have known, about them. Moreover, when determining those facts, all disputed issues must be viewed in the light most favorable to Jarmuth. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).

## b. **Standard of Review**

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 255. The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). This burden does not require the moving party to show evidence that proves absence of a genuine issue of material fact, but only to point out its absence. <u>Id</u>.

The burden then shifts to the party opposing the motion. The adverse party may not rest upon mere allegations or denials, <u>Anderson</u>, 477 U.S. at 248, and summary judgment is appropriate if the adverse party fails to show, under Rule 56, the existence of an

element essential to that party's case.  <u>Celotex</u>, 477 U.S. at 322.

A mere scintilla of evidence supporting the case is insufficient.

<u>Anderson</u>, 477 U.S. at 252.   With regard to the burden on the

adverse party, Rule 56(e) provides in part that:

> [w]hen a motion for summary judgment is made
> and supported as provided in this rule, an
> adverse party may not rest upon the mere
> allegations or denials of the adverse party's
> pleadings, but the adverse party's response,
> by affidavits or as otherwise provided in this
> rule, must set forth specific facts showing
> that there is a genuine issue for trial.   If
> the adverse party does not so respond, summary
> judgment, if appropriate, shall be entered
> against the adverse party.

## c. Defamation

In this case, there is no dispute that Jarmuth is a private

figure bringing a common law defamation claim.  "In West Virginia,

the essential elements for a successful defamation action by a

private   individual   are   (1)   defamatory   statements;   (2)   a

nonprivileged communication to a third party [the publication

requirement]; (3) falsity; (4) reference to the plaintiff; (5) at

least negligence on the part of the publisher; and (6) resulting

injury." <u>Crump v. Beckley Newspapers, Inc.</u>, 173 W.Va. 699, 320

S.E.2d 70, 77 (1983).  Moreover, "[a] court must decide initially

whether as a matter of law the challenged statements in a

defamation action are capable of a defamatory meaning." <u>Belcher v.</u>

-11-

<u>**AMENDED MEMORANDUM OPINION AND ORDER**</u>

<u>Walmart Stores, Inc.</u>, 211 W.Va. 712, 568 S.E.2d 19, 26 (2002) (quoting <u>Long v. Egnor</u>, 176 W.Va. 628, 346 S.E.2d 778, 780 (1986)). "A statement may be defined as defamatory if it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." <u>Crump</u>, 320 S.E.2d at 77 (quoting Restatement (Second) of Torts § 558 (1977))(internal quotations omitted).

The publication of defamatory content by spoken word is slander, while the publication of defamatory content by written or printed word is libel. <u>Restatement (Second) of Torts</u> § 568(1-2) (1977). "'Publication' is a term of art in the law of defamation. It does not require the printing and mass dissemination of the defamation. Instead 'publication' applies to both slander and libel and means any form of intentional or negligent communication of a defamatory statement to a third person, that is, to someone other than the originator and the person defamed." <u>Crain v. Lightner</u>, 178 W.Va. 765, 364 S.E.2d 778, 785 (1987); <u>See also</u> <u>Restatement (Second) of Torts</u> § 577(1).

In his motion for summary judgment, Frinzi asserts that Jarmuth has simply failed to provide any evidence that statements capable of a defamatory meaning were published to Jarmuth's employer in West Virginia. He argues that, despite the extensive

record in this case, discovery did not reveal the existence of any actual statements to support the allegations in Jarmuth's complaint. Therefore, he asserts, the Court should find that Jarmuth has not satisfied his burden to set forth specific statements which are at least capable of a defamatory meaning and which would satisfy the publication element in Crump.

With regard to Jarmuth's allegations that Frinzi or his agents made telephone calls to Healy and others communicating oral statements capable of a defamatory meaning, the Court agrees. However, Waters' letter to Healy is sufficient evidence to satisfy Jarmuth's responsive burden under Rule 56(e) with regard to the defendant's, or his agents', publication of written statements capable of a defamatory meaning as a matter of law. As outlined below, both deposition testimony and the Court's thorough *in camera* review of the FBI Records compel these findings.

### i. Alleged Slander

#### A. Trooper Stevens

At paragraph 76 of his complaint, Jarmuth alleges that, on or about September 1, 2000, during a telephone conversation between Trooper Stevens and Healy, Trooper Stevens, at the behest of Frinzi and Waters, told Healy that, on the Nemacolin Tape, Jarmuth had confessed various abuses against the Frinzis' daughter, and asked

-13-

Healy to terminate Jarmuth's FBI employment.  Jarmuth asserts he was present in Healy's office for the conversation, which was held over the speaker phone.  Similarly, at paragraphs 98 and 99 of his complaint, Jarmuth alleges that, on or about November 29, 2000, Trooper Stevens called Healy at the behest of Frinzi and Waters and stated that Jarmuth was a "troublemaker" and that his employment with the FBI should be terminated.  Again, Jarmuth asserts he was present in Healy's office during the telephone conversation.  At paragraph 196 of his complaint, Jarmuth reiterates his allegations.

In his deposition, Trooper Stevens acknowledges that he spoke to Healy regarding this case (Stevens Depo. at 149); however, he flatly denies ever being asked by Frinzi or Waters to 1) use the alleged contents of the Nemacolin Tape against Jarmuth with the FBI, 2) telephone FBI officials with regard to Jarmuth, or 3) telephone FBI officials in an effort to interfere with Jarmuth's employment.  (Stevens Depo. at 146-147.)  Further, the FBI records are devoid of any mention of the alleged telephone conversations or of any allegedly slanderous statements that may have occurred during such conversations.[8]  Therefore, the Court finds that Jarmuth has failed to provide even a scintilla of evidence beyond

---

[8]     Tim Healy has been unavailable throughout these proceedings in part due to his position with the FBI.  He has not been deposed and has not filed an affidavit with respect to any issue in this case.

**AMENDED MEMORANDUM OPINION AND ORDER**

his own unsupported allegations that Trooper Stevens published statements capable of a defamatory meaning to Jarmuth's FBI employers in West Virginia at the behest of Frinzi. Accordingly, the Court **GRANTS-IN-PART** Frinzi's motion for summary judgment with regard to allegations of slanderous statements published by Trooper Stevens.

### B. Trooper Soliday

At paragraphs 89 through 91 of his complaint, Jarmuth alleges that, on or about September 8, 2000, Trooper Soliday called Healy at the behest of Frinzi and threatened to use the allegations on the Nemacolin Tape against Jarmuth in an effort to interfere with his FBI employment. Jarmuth asserts that he was again present in Healy's office during the telephone conversation. At paragraph 197 of his complaint Jarmuth reiterates his allegations.

In her deposition testimony, Trooper Soliday could not recall ever being asked by Frinzi or Waters to call Jarmuth's supervisors, and denied ever speaking to anyone concerning Jarmuth's employment, either within the FBI or elsewhere.[9] (Soliday Depo. at 61.)

---

[9] On questioning by defense counsel, Soliday testified:

Q: Did Jim Frinzi or Kathleen Waters ask you to call any of Mr. Jarmuth's supervisors at any point in time?
A: Not that I recall.
Q: Did they – did you ever call any of Mr. Jarmuth's supervisors at any point in time?
A: I never talked to any one of the supervisors.

**AMENDED MEMORANDUM OPINION AND ORDER**

Further, the FBI records are devoid of any mention of the alleged telephone conversations and any allegedly slanderous statements. Thus, Jarmuth has failed to provide even a scintilla of evidence beyond his own unsupported allegations that Trooper Soliday published statements capable of a defamatory meaning to Jarmuth's FBI employers in West Virginia at the behest of Frinzi. Accordingly, the Court **GRANTS-IN-PART** Frinzi's motion for summary judgment with regard to allegations of slanderous statements published by Trooper Soliday.

### C. Waters

At paragraphs 110 and 176-177 of his complaint, Jarmuth alleges that on or about April 8, 2001, through April 10, 2001, Waters "deluged" Jarmuth's West Virginia FBI employer, and others with whom he did business in conjunction with his FBI role, with defamatory telephone calls relating to allegations of sexual abuse of the Frinzis' child and demanding that Jarmuth's employment be terminated. He contends that Waters made at least four (4) calls, and that some of those calls were received by 1) Gary Lusher, CEO of the National White Collar Crime Center located in West Virginia,

---

Q: Did you ever talk to anyplace that he was employed?
A: No.

(Soliday Depo. at 60-61.)

2) Healy, Jarmuth's immediate supervisor in West Virginia, and 3) Michael Selves of the FBI, whose office was located in Northern Virginia, but who functioned as Jarmuth's "final rater", applying rating information supplied by Healy regarding Jarmuth.

In her deposition, Waters admitted to calling the FBI regarding Jarmuth. (Waters Depo. at 109-111.) According to her testimony, she cannot remember when such calls were made, or to whom she may have spoken. Id. However, she testified that the purpose of such calls were to determine whether Jarmuth was in fact employed by the FBI. Id.

Despite the fact that Waters admits she called the FBI and others about Jarmuth, there is insufficient evidence to give rise to a genuine issue of material fact that such calls involved the publication of statements capable of a defamatory meaning. Jarmuth's complaint asserts that Gary Lusher received some of Waters' allegedly defamatory calls. However, Lusher's deposition testimony reveals that Lusher had never heard of Frinzi or Waters prior to the instant litigation. (Lusher Depo. at 23.) Moreover, Lusher specifically denies receiving telephone calls from Waters on September 8 or 9, 2001. Id. at 25. Further, Michael Selves is deceased and there is no evidence in the record that he received any telephone calls from Waters. Finally, while Healy has not

-17-

provided testimony in this case, the voluminous FBI records reviewed by the Court are devoid of information regarding any calls by Waters to Healy or others in the FBI regarding Jarmuth. Thus, there is no evidence beyond Jarmuth's *ipse dixit* that Waters published slanderous communications regarding Jarmuth to any third party in West Virginia. Accordingly, the Court **GRANTS-IN-PART** Frinzi's motion for summary judgment with regard to allegations of slander by Waters.

### D. Frinzi

Jarmuth's complaint contains no allegations that Frinzi attempted to interfere with Jarmuth's employment by making defamatory statements regarding Jarmuth to individuals in West Virginia. Rather, his complaint asserts that Frinzi published defamatory statements to others outside the state, and then sought their assistance in defaming Jarmuth through communications with Jarmuth's West Virginia employer. For the reasons outlined above, the Court finds that there is no evidence that Frinzi published slanderous statements capable of a defamatory meaning to Jarmuth's FBI employers in West Virginia. Accordingly, the Court **GRANTS-IN-PART** Frinzi's motion for summary judgment with regard to allegations of slanderous statements by Frinzi.

### ii. Alleged Libel

-18-

**AMENDED MEMORANDUM OPINION AND ORDER**

At paragraph 97 of his complaint, Jarmuth asserts that, on November 27, 2000, Waters mailed Healy a signed statement that included defamatory allegations regarding Jarmuth's alleged sexual impropriety with the Frinzis' child. This is the only allegation of libel in the complaint. In Waters' deposition, she admitted to writing a letter to Healy, but does not remember the timing of that letter. (Waters Depo. at 24 and 69.) The FBI records provided to the Court contain a typewritten letter addressed to Special Agent Tim Healy and containing the typed name "Kathleen (Katie) Waters" on the signature line. As noted earlier, attached to the letter is a copy of Jarmuth's civil complaint in the Court of Common Pleas of Fayette County, Pennsylvania with handwritten margin notes included.

The letter contains the statement that "ON TAPES, RON ADMITTED TO REGULARLY HAVING SEX WITH ANGELA IN THE SAME BED WITH [the Frinzis' child]."[10]  Further, the margin notes reiterate that allegation at pages 12 and 15 of the complaint. The handwritten note on page 12 reads, "[h]e told us they all slept in the same bed even during sex," while the note on page 15 states:

_____

[10]    Ronald Jarmuth is the only plaintiff in this case. To the extent Waters' letter contains statements regarding others besides Jarmuth that may be capable of a defamatory meaning, such statements are not at issue here.

-19-

We accused him because he admitted to us at Nemacolin.
He said he did all of these things.

That note is located directly beside Jarmuth's listing in his Court

of Common Pleas complaint of Frinzi's and Waters' allegations

against him.[11] (<u>See</u> nt. 4, *supra*.)

    "Courts assess the meaning of an allegedly libelous statement

from the perspective of a reasonable reader." <u>Bell v. National</u>

<u>Republican Congressional Committee</u>, 187 F.Supp.2d 605, 615-616

(S.D.W.Va. 2002). Further, "[i]n assessing a communication, words

are to be taken in context." <u>Id.</u> at 615(citing Restatement (Second)

of Torts § 563 comment c).   Moreover, "[s]tatements imputing

serious sexual misconduct are defamatory per se because they are so

obviously and materially harmful to reputational interests." <u>Id.</u> at

616. Finally, "[w]here the statements are libelous per se, damages

are presumed." <u>Id.</u> (citing <u>Milan v. Long</u>, 78 W.Va. 102, 88 S.E.

618, 620 (1916)).

    As an initial matter, when viewed in the light most favorable

to Jarmuth, the letter received by Healy and provided to the Court

in  the  FBI  records  contains  allegations  of  serious  sexual

---

[11]    As noted supra, the FBI Records were provided for the Court's in
camera review.  Those records remain under seal, and the parties were not shown
a copy of the letter with the attachments during the June 12, 2006 hearing.
However, the Court published on the record the statement at issue here: To wit
"ON TAPES, RON ADMITTED TO REGULARLY HAVING SEX WITH ANGELA IN THE SAME BED WITH
[the Frinzis' child]."

misconduct by Jarmuth – that is, "ON TAPES, RON ADMITTED TO
REGULARLY HAVING SEX WITH ANGELA IN THE SAME BED WITH [the Frinzis'
child]." Further, the margin notes included on the attached
complaint reiterate those allegations. Accordingly, there is
evidence of per se defamatory statements under West Virginia law
regarding Jarmuth. Crump elements 1 and 4. As such, damages are
presumed. Crump element 6. Further, Healy received the letter
addressed to him in the mail, evidencing at least negligence on the
part of the sender. Crump element 5. Healy's receipt also
evidences the publication of the allegedly defamatory statements to
persons responsible for supervising Jarmuth's work for the FBI in
West Virginia.

It is not clear from the record, however, whether Waters'
publication was nonprivileged, as required by Crump element 2.[12]
Although, the parties have not significantly addressed this issue,
the Court concludes that a genuine issue of material fact exists
with regard to whether the letter was published to Healy under
circumstances that would trigger a qualified privilege defense.

---

[12]    In West Virginia, qualified privilege is a defense to defamation.
Crump, 320 S.E.2d at 78.    Such privilege has been found to arise when, for
example, the publication of defamatory material is made to protect one's own
legitimate interests, to protect the legitimate interests of another, or to
inform one charged with the performance of a public duty. Id. at 79.

**AMENDED MEMORANDUM OPINION AND ORDER**

Further, the record in this case gives no indication whether Jarmuth's alleged conduct as published in Waters' letter to Healy is false, as is required by <u>Crump</u> element 3. Thus, the falsity of the allegations also constitutes a question of fact for the jury.

Further, Waters is no longer a party to this case. Frinzi alone remains. If the allegations contained in Waters' letter were indeed defamatory, then it presents a genuine issue of material fact as to whether Waters published that letter under circumstances sufficient to extend liability to Frinzi under an agency theory, or, in the alternative, whether the letter's liberal use of the word "we" supports the inference that Frinzi published the libel in concert with Waters.[13]

Accordingly, issues of material fact exist about the defamatory nature of the letter Waters allegedly sent to Healy in West Virginia. Thus, the Court **DENIES-IN-PART** Frinzi's motion for summary judgment regarding allegations of libel in Jarmuth's complaint. But for the Court's dismissal on the grounds that follow in the next section of this Memorandum Opinion, Jarmuth's

---

[13]    "There may be more than one 'publisher' of libel . . . . [O]ne who requests or procures, as well as one who aids, another to publish the defamation is responsible for a 'publication' whenever it takes place." <u>Crain</u>, 364 S.E.2d at 785 (citing <u>Laun v. Union Elect. Co.</u>, 350 Mo. 572, 580, 166 S.W.2d 1065, 1070 (1942)).

common law defamation claim on these limited grounds would be suitable for trial.

## d. Grounds for Dismissal

### i. Jarmuth's Western District of Pennsylvania Action

On October 12, 2000, Jarmuth filed suit against Frinzi, Waters, and Todd Begg in United States District Court for the Western District of Pennsylvania in Civil Action Number 00-CV-2031. His complaint alleged causes of action under the Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2510-2521; Pennsylvania's Wiretapping and Electronic Surveillance Control Act, 18 Pa, Cons. Stat. Ann. §§ 5701-5781; and Pennsylvania common law. Jarmuth also sought a declaratory judgment with regard to allegations Frinzi and others allegedly made against him. The complaint asserted that federal question jurisdiction existed over the wiretapping claims pursuant to 28 U.S.C. § 1331, and that supplemental jurisdiction existed over the Pennsylvania common law claims pursuant to 28 U.S.C. § 1367.

On May 14, 2002, the Honorable Gary L. Lancaster of the Western District of Pennsylvania dismissed Jarmuth's federal wiretap claims and his claim for declaratory relief. After recognizing that Jarmuth's remaining common law claims for invasion of privacy and defamation were based on Pennsylvania state law,

(Doc. No. 3, Ex. B at 10), Judge Lancaster evaluated whether he should retain supplemental jurisdiction over those claims. Relying on case law from the Third Circuit, he concluded that he should not because the underlying federal claims had been dismissed and no extraordinary circumstances warranted retaining jurisdiction.

Jarmuth appealed the dismissal of his claims to the United States Court of Appeals for the Third Circuit, which on March 24, 2004, affirmed the district court's dismissal of those supplemental claims. On April 15, 2004, the Third Circuit certified its Judgment Order as a true copy and issued it in lieu of a formal mandate.

On April 6, 2004, Jarmuth filed Civil Action Number 1:04CV63 in this Court based on diversity jurisdiction. At paragraph fifteen (15) of his complaint, he relies on the tolling provision outlined in 28 U.S.C. § 1367(d) to support his contention that his claims were timely filed in this action.[14] Although *pro se* complaints are held to less stringent standards, see Haines v. Kerner, 404 U.S. 519, 520 (1972), Jarmuth's reliance on 28 U.S.C

---

[14]     Paragraph fifteen (15) of Jarmuth's complaint in Civil Action 1:04CV63 states:

Per 28 USC 1367(d), Plaintiff had at least 30 days to refile in any court of proper jurisdiction all claims before the original federal court through supplemental jurisdiction. This action is filed within the 30 day period.

<u>AMENDED MEMORANDUM OPINION AND ORDER</u>

§ 1367(d) to toll the applicable statute of limitations to his common law defamation claim under West Virginia law is misplaced.

### ii. 28 U.S.C. §1367(d) and limitations calculation

Subsection (a) of 28 U.S.C. § 1367 provides that a district court may exercise supplemental jurisdiction over state law claims that are so related to claims over which the court is exercising original jurisdiction that "they form part of the same case or controversy under Article III of the United States Constitution." Subsection (d) of 28 U.S.C. § 1367 is a savings provision that "tolls the statute of limitations on any state claim over which a federal court has exercised supplemental jurisdiction until [at least] 30 days after its dismissal." <u>Edmondson & Gallagher v. Alban Towers Tenants Ass'n</u>, 48 F.3d 1260, 1267 (D.C. Cir. 1995). It provides:

> The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of thirty days after it is dismissed unless State law provides for a longer tolling period.

In this case, Jarmuth's reliance on § 1367(d)'s tolling provision is improper because the common law defamation claim before this Court is not the same defamation claim Judge Lancaster dismissed in May, 2004. As outlined in Section III above,

-25-

**AMENDED MEMORANDUM OPINION AND ORDER**

Jarmuth's current defamation claim was brought pursuant to West Virginia common law for allegedly defamatory statements published in West Virginia and causing harm in West Virginia. Although Jarmuth's defamation claim in the Western District of Pennsylvania also alleged the publication of some defamatory communication in West Virginia, Judge Lancaster's order clearly established that claim as arising under Pennsylvania common law. Further, Jarmuth's defamation claim in the Western District of Pennsylvania lay against Frinzi, Waters, and Todd Begg, while his defamation claim in this case only involves Frinzi. Despite his apparent understanding to the contrary, Jarmuth's present defamation claim is separate and distinct from the defamation claim dismissed in the Western District of Pennsylvania.

Moreover, the tolling provision of 28 U.S.C. § 1367(d) applies to supplemental state law claims that are refiled in state court subsequent to dismissal, not to a new case filed in another federal court. See Jinks v. Richland County, S.C., 538 U.S. 456, 459 (2003)(surmising that "some claims asserted under § 1367(a) will be dismissed because the district court declines to exercise jurisdiction over them and, if they are to be pursued, *must be refiled in state court.* To prevent the limitations period on such supplemental claims from expiring while the plaintiff was

fruitlessly pursuing them in federal court, § 1367(d) provides a tolling rule that *must be applied by state courts* . . . .)(emphasis added).

After Jarmuth's case was dismissed by the Western District of Pennsylvania, § 1367(d) tolled the Pennsylvania limitations period applicable to his claim, thereby giving him the opportunity to refile his common law defamation claim in Pennsylvania state courts. Jarmuth failed to do that, filing instead a complaint based on diversity jurisdiction in this Court. Even though his complaint alleges state law claims, federal procedural law applies to those claims.

Accordingly, the Court holds that the tolling provision of 28 U.S.C. § 1367(d) is inapplicable and has not tolled the one year limitations period applicable to common law defamation claims in West Virginia. By Jarmuth's own admission, he knew of the allegedly libelous letter received by Healy sometime between November 27, 2000, and December 4, 2000. Consequently, pursuant to W.Va. Code § 55-2-12, the one year limitation period applicable to actions for defamation ran no later than April 4, 2001. Jarmuth, however, failed to file his complaint until April 6, 2004, well beyond the limitations period, and his West Virginia common law defamation claim clearly exceeds the applicable limitations period.

## AMENDED MEMORANDUM OPINION AND ORDER

Even assuming arguendo that § 1367(d) somehow could be read to apply to Jarmuth's defamation claim before this Court, it would still be untimely because the operation of the statutory tolling provision applicable to a supplemental claim is triggered by that claim's dismissal from federal district court, not the conclusion of the appellate review process.

The language of § 1367(d), speaking only of a claim's "dismissal," is silent as to whether it is the claim's dismissal from the district court that triggers the tolling provision. The issue appears to be one of first impression in the Fourth Circuit. When faced with a question of statutory construction, the Court's analysis "must begin with the language of the statute." Kofa v. U.S. I.N.S., 60 F.3d 1084, 1088 (4th Cir. 1995)(citing Norfolk & W. Rwy. v. American Train Dispatcher's Ass'n., 499 U.S. 117 (1991)). Courts have a duty to construe a statute's language consistently with its plain meaning, and in accord with common sense. Id. (citing Sutton v. United States,819 F.2d 1289, 1292 (5th Cir. 1987), and First United Methodist Church v. United States Gypsum Co., 882 F.2d 862, 869 (4th Cir. 1989)).

Here, 28 U.S.C. § 1367(d) provides that the period of limitations for state law claims before a federal court on supplemental jurisdiction "shall be tolled while the claim is

pending and for a period of thirty days after it is *dismissed* unless State law provides for a longer tolling period." (emphasis added). No ambiguity attaches to the word "dismissed." Dismissed is the past-tense form of the word dismiss, and to dismiss is to "terminate (an action or claim) without further hearing, esp. before the trial of the issues involved." <u>Black's Law Dictionary</u> (8th Ed. 2004). Given that meaning, common sense counsels that it is the ruling of the trial court judge that effects the dismissal of a claim. Further, pursuant to 28 U.S.C. § 1291, courts of appeal have jurisdiction over appeals of all *final* decisions by the district courts, thus lending further support to the common sense interpretation that a claim is "dismissed" by order of the district court.

The district court for the Western District of Pennsylvania dismissed Jarmuth's common law defamation claim by order on May 14, 2002, thus triggering the savings provision. Section 1367(d) provides for a thirty (30) day tolling period unless state law provides for a longer period. West Virginia law provides a one year tolling period for actions where the initial pleadings were

<u>**AMENDED MEMORANDUM OPINION AND ORDER**</u>

timely filed and the action was involuntarily dismissed for non-meritorious reasons.[15] W.Va. Code § 55-2-18(a).

There is no dispute that Jarmuth timely filed his common law defamation claim in the Western District of Pennsylvania. As a result, if, indeed, he had the right to refile in federal court in West Virginia under § 1367(d), he only had until May 14, 2003, or one year after his claim's dismissal, to refile under West Virginia law and 28 U.S.C. § 1367(d). He failed to do so, instead filing his claims in this Court over two years later, on April 6, 2004. Thus, even if the tolling provision of § 1367(d) properly applied to his current claim, which the Court has found it does not, his claim still would be untimely under West Virginia law.

Accordingly, the Court concludes that Jarmuth's West Virginia common law defamation claim, the only cause of action remaining in this case, was untimely filed and **DISMISSES IT WITH PREJUDICE.**

---

[15]     W.Va. Code § 55-2-18(a) provides:

For a period of one year from the date of an order dismissing an action or reversing a judgment, a party may refile the action if the initial pleading was timely filed and: (i) the action was involuntarily dismissed for any reason not based on the merits of the action; or (ii) the judgment was reversed on a ground which does not preclude a filing of new action for the same cause.

### e. **Cause of Action for Tortious Interference Not Pled**

Jarmuth also contends that Count V of his complaint pleads a cause of action for tortious interference with a business relationship under West Virginia law. "The causes of action for tortious interference with business relationships and for defamation are distinguishable." Garrison, 438 S.E.2d at 13. "To establish prima facie proof of tortious interference, a plaintiff must show: (1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages." Torbett v. Wheeling Dollar Savings & Trust, 173 W.Va. 210, 314 S.E.2d 166, Syl. Pt. 2 (1983).

In this case, the allegations throughout Jarmuth's complaint assert that the allegedly defamatory communications of Frinzi and his agents were made with the intent of interfering with Jarmuth's FBI employment in West Virginia and led to his termination. "While defamation is not a necessary element for tortious interference with business relationship, defamation may, in certain cases, be part of the interference." Garrison, 438 S.E.2d at 13. However, the Court finds no claim for tortious interference to lie here.

-31-

**AMENDED MEMORANDUM OPINION AND ORDER**

Not until June 9, 2006, in his response brief to a pretrial motion filed by the defendant, does Jarmuth ever assert the existence of a cause of action for tortious interference. Further, the contentions in Jarmuth's complaint alleging Frinzi's and others' intentional interference with his FBI employment are all based on the alleged publication of defamatory communications. As discussed above, the Court has concluded that only Waters' letter to Healy contains statements capable of a defamatory meaning, and there is no evidence in the record 1) that Waters' intent in sending the letter was to seek termination of Jarmuth's employment, or 2) that her act in sending the letter caused the FBI to rescind its offer of employment.

What the evidence does establish is that Jarmuth had previously disclosed both the existence of his civil case and the nature of the allegations and accusations related to that case to the FBI. While the content of Waters' letter is certainly capable of a defamatory meaning, and the sending of that letter an intentional act, Jarmuth's conditional employers already were on notice that Jarmuth was involved in a lawsuit that involved the alleged sexual abuse of a child. To the extent Jarmuth now believes he has filed a tortious interference claim under West

Virginia law, the Court concludes otherwise and finds that what was pled was a claim for special damages for defamation.

Moreover, even if the Court liberally construed Jarmuth's complaint to present a claim for tortious interference with his employment, that claim would be untimely. Pursuant to W.Va. Code § 55-2-12, because a plaintiff's alleged injury is to a property right, a two-year limitation period applies to an action for tortious interference with a business relationship. Garrison, 438 S.E.2d at 13. Jarmuth knew of Waters' letter on or about the beginning of December, 2000, and the FBI rescinded its offer of appointment to Jarmuth on April 21, 2001. His claim here was not filed until April, 2004, three years later, well beyond the two-year limitation period applicable to claims of tortious interference.

## V. **Pending Motions**

The record reflects the prolific motions filings associated with Jarmuth's defamation claim. Many pending motions were before the Court during the June 12, 2006 hearing. Among those was Jarmuth's motion for reconsideration of the Magistrate Judge's Order sealing from public view the entire record in this case. (Doc. No. 212.) Because this request implicates enormous difficulties for the staff of the Clerk's office, who would be

AMENDED MEMORANDUM OPINION AND ORDER

required to redact all the personal identifiers of any minor child

identified in the voluminous filings, and because the parties and

their representatives have access to the complete physical case

file in the Clerk's Office at the Clarksburg, West Virginia, point

of holding Court, the Court will schedule a hearing on Jarmuth's

motion for reconsideration and orders the docket to remain **SEALED**

from public view until further notice.    All remaining pending

motions in this case that were filed prior to the Court's June 12,

2006 hearing, are **DENIED AS MOOT.**[16]

### VI. Conclusion

For the reasons outlined above, and the reasons stated on the

record of the June 12, 2006 hearing, the Court:

(1) **GRANTS-IN-PART** and **DENIES-IN-PART** the defendant's motion
for summary judgment (Doc. No. 217);

(2) **DEFERS** ruling on the plaintiff's motion for
reconsideration of the Magistrate Judge's Order sealing the
entire docket in this case to the extent it seeks to unseal
the docket (Doc. No. 212);

(3) **ORDERS** that the docket remain **SEALED** from public view, and
that the **FBI Records** provided to the Court for *in camera*
review remain **SEALED** from view by both the parties and the
public until further Order of the Court;

---

[16]     Motions DENIED AS MOOT include: Doc. No. 158; Doc. No. 176; Doc. No.
179; Doc. No. 192; Doc. No. 221; Doc. No. 223; Doc. No. 224; Doc. No. 228; Doc.
No. 232; Doc. No. 238; Doc. No. 243; Doc. No. 248; Doc. No. 249; Doc. No. 250;
Doc. No. 251; Doc. No. 252; Doc. No. 253; Doc. No. 254; Doc. No. 255; Doc. No.
256; Doc. No. 257; Doc. No. 258; Doc. No. 259; Doc. No. 260; Doc. No. 261; Doc.
No. 262; Doc. No. 263; Doc. No. 264; Doc. No. 265; Doc. No. 302;

<u>**AMENDED MEMORANDUM OPINION AND ORDER**</u>

(4) **DENIES AS MOOT** all other pending motions in this case filed prior to the Court's June 12, 2006 hearing, (see nt. 16, *supra*); and

(5) **DISMISSES** this case **WITH PREJUDICE** because the remaining West Virginia common law defamation claim was untimely filed.

The Clerk is directed to transmit copies of this Order to the

*pro se* plaintiff and counsel of record.

DATED: July **25**, 2006.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE